IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

HOWARD ACQUISITIONS, LLC

    Plaintiff,

    v.     CIVIL NO.: WDQ-09-2651

GIANNASCA NEW ORLEANS, LLC
and CRESCENT CITY ESTATES,
LLC,

    Defendants.

MEMORANDUM OPINION

Howard Acquisitions, LLC ("Howard") sued Giannasca New Orleans, LLC ("GNO") and Crescent City Estates ("CCE") for breach of contract. Pending is Intervenor Stuart C. Fisher's motion to dismiss Howard's counterclaim against him for lack of personal jurisdiction. For the following reasons, Fisher's motion will be denied.

I. Background[1]

CCE and GNO are Louisiana LLCs. Notice of Removal ¶ 8. CCE is the sole member of GNO, which was formed in 2005 to buy the Plaza Tower in New Orleans. Def.'s Resp. To Pl.'s Req. Admis. No. 1; James Conway Aff. ¶ 5, April 26, 2010. Edward

---

[1] For Fisher's motion to dismiss for lack of personal jurisdiction, all "disputed facts and reasonable inferences" are to be drawn in Howard's favor. *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 396 (4th Cir. 2003).

Giannasca, II was a member of CCE and its manager, Fisher and Michael McCrary were also members. Michael McCrary Aff. ¶ 6, Sept. 18, 2007. In November 2005, after Hurricane Katrina, GNO sold the Plaza Tower to Howard Properties, LLC. Conway Aff. ¶ 5. Howard, through its predecessors in interest, financed Howard Properties' purchase of the Plaza Tower and obtained a security interest in the property. *Id.* ¶ 6 & Ex. 8.

On November 8, 2005, to complete the sale, GNO executed a letter agreement to "pay or reimburse [Howard Properties] for all remedial work to restore the property to its condition as it existed prior to Hurricane Katrina" (the "November Letter Agreement"). *Id.*, Ex. 1. Howard alleges that Giannasca stated that insurance proceeds for the hurricane damage would be used to satisfy the November Letter Agreement, but the insurance proceeds were paid to CCE instead.[2]

On July 25, 2008 Howard sued GNO and CCE in Louisiana state court, alleging that they never fulfilled their obligation under the November Letter Agreement. ECF No. 1. On August 1, 2008, GNO and CCE removed the case to the United States District Court for the Eastern District of Louisiana. *Id.* On August 5, 2008, Fisher moved to intervene. ECF No. 35.

---

[2] Compl. ¶¶ 27-35. When Hurricane Katrina struck New Orleans, CCE had insured the Plaza Tower for $30 million through two insurance companies. McCrary Aff. ¶ 14. CCE eventually recovered $12 million for hurricane damages. *Id.* ¶ 15; Michael McCrary Dep. 71:8-12, Feb. 2, 2010.

2

Fisher alleged that he had acquired the right to buy the Plaza Tower in 2003 to convert it to condominiums, and that in 2005, Giannasca and McCrary had agreed to invest in the project. Inter. Compl. ¶¶ 1-6. Fisher "went with Mr. Giannasca to Baltimore to ensure that he [and McCrary] w[ere] on board" for the project, and the three then created several limited liability companies—including GNO and CCE—for that purpose. Stuart Fisher Dep. 111:1-6, March 6, 2008; Inter. Compl. ¶¶ 4-7.[3] GNO exercised Fisher's right to buy the Plaza Tower, but hurricane damage later made the condo conversion infeasible. *Id.* ¶¶ 6 & 18.

Fisher alleged that after Hurricane Katrina, Giannasca and McCrary had financial difficulties and agreed to convey their interests in CCE and GNO to Fisher in exchange for his promise to repair the Plaza Tower and indemnify Giannasca, his wife, and McCrary against future liability from the project. *Id.* ¶¶ 26-31. The agreement culminated in an October 5, 2005 letter (the "October Letter Agreement"). *Id.* ¶¶ 35, 57; ECF No. 92, Ex. D.[4]

---

[3] *See also* Stuart Fisher Dep. 21:18-22:2, March 25, 2010.

[4] In the letter, Fisher agreed to "defend, indemnify and hold [Giannasca], [Suzanne Giannasca], and Michael McCrary . . . harmless from any liabilities, claims or actions." ECF No. 92, Ex. D. Fisher also stated:

> The prospect of insurance reimbursement seems bleak and not available. While I personally will pursue the attack with our public adjuster, I believe that this case will only end up with insurance lawyers and

3

Although only Fisher and Giannasca signed the October Letter Agreement, Fisher states that he obtained McCrary's agreement during a phone call with McCrary, who was in Baltimore. Stuart Fisher Dep. 50:20-52:16, March 25, 2010.

Fisher alleged that in November 2005, he, through CCE and GNO, had sold the Plaza Tower to Howard Properties. Inter. Compl. ¶ 39. The insurance claims were "a subject of negotiation at the sale" but the parties agreed the insurance proceeds "would remain with [Fisher]." *Id.* His complaint sought a declaratory judgment of his entitlement to the insurance proceeds. *Id.* ¶ 57.

On August 7, 2009, the Eastern District of Louisiana granted Fisher's motion to intervene. ECF No. 36. On September 21, 2009, GNO and CCE—which dispute Fisher's ownership—moved for summary judgment on his complaint because the United States Bankruptcy Court for the Eastern District of Louisiana had determined that Fisher did not own CCE; thus, his complaint was barred by *res judicata*. ECF No. 65.

---

> subsequent litigation. Quite frankly, my goal is getting this project sold and moving on without losing any money or investor confidence. I assume any and all obligations that you have signed on for with our public adjuster, but as the sole owner if pursuing the insurance claim appears unlikely I will no doubt abandon the claim. As you are aware, the correspondence in regards to insurance indicates that it will be a long hard road ending as just received— DENIED!

*Id.*

On September 25, 2009, Howard answered Fisher's complaint and counterclaimed against him. ECF No. 68. Howard alleged that Fisher had wrongfully received and concealed the insurance proceeds to which it was entitled under the November Letter Agreement. *Id.* To accomplish this, Fisher told James Walsh, McCrary's Maryland accountant, that "there would be no [insurance] payout,"[5] and in 2006, he traveled to Baltimore to meet with McCrary and Giannasca, who had become suspicious that he was hiding the proceeds.[6] Fisher then used the proceeds to "pa[y] expenses for Giannasca Development Group and [to]

---

[5] James Walsh Dep. 30:13-31:5, March 22, 2010. Walsh's conversations with Fisher were "always over the phone," and his testimony does not establish whether Fisher was aware that he was in Maryland when they spoke or whether Fisher initiated the calls. *Id.* 32:1-3.

[6] An August 8, 2006 email from Fisher to McCrary states:

> While I do not believe that I have anything to discuss with you in regards to the insurance proceeds[,] you piss me off when you say that I am trying to hide what I got and that I should be straight with you. . . I disagree that a lot of money has been hidden from you. . . . You, [Giannasca], and I have to meet face to face to resolve all issues. I believe that is possible . . . Let me know what your schedule is and perhaps all of us can meet over the weekend. Because both you and Ed are in Baltimore it only make[s] sense for me to come see both of you.

Pl.'s Opp'n, Ex. I. In his March 25, 2010 deposition, Fisher stated that he did meet with McCrary and Giannasca in Baltimore after that email. Fisher Dep. 21:24-22:5, March 25, 2010.

5

advance[] [Giannasca] money to pay . . . expenses . . . in Baltimore." Stuart Fisher Dep. 241:15-242:1, June 4, 2007.

On October 7, 2009, the case was transferred to this Court. ECF Nos. 72 & 73. Fisher moved for voluntary dismissal of his complaint on November 4, 2009. ECF No. 81. On January 11, 2010, he moved to dismiss Howard's counterclaim for lack of personal jurisdiction. ECF No. 91. On March 3, 2010, this Court granted Fisher's motion for voluntary dismissal of his complaint, and denied his motion to dismiss the counterclaim without prejudice to permit limited discovery of jurisdictional facts. ECF No. 100. On November 2, 2010, after discovery, Fisher filed his second motion to dismiss for lack of personal jurisdiction. ECF No. 140.

II. Analysis

    A. Standard of Review

The party asserting a claim bears the burden of proving personal jurisdiction, which must be shown by a preponderance of the evidence. *Carefirst*, 334 F.3d at 396 (*citing Mylan Labs., Inc. v. Akzo, N.V.*, 2 F.3d 56, 59-60 (4th Cir. 1993)). The court may resolve disputed facts after an evidentiary hearing or defer ruling until receipt of relevant evidence at trial. *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989). When the court decides the jurisdiction issue without an evidentiary hearing and relies solely on the complaint, affidavits, and discovery

materials, "the plaintiff need only make a *prima facie* showing of personal jurisdiction." *Carefirst,* 334 F.3d at 396. In deciding whether the plaintiff has made a *prima facie* showing, the court "must draw all reasonable inferences arising from the proof, and resolve all factual disputes, in the plaintiff's favor." *Mylan,* 2 F.3d at 60.

B.   Analysis

Fisher argues that Howard's claim against him should be dismissed because his contacts with Maryland are insufficient to show specific or general jurisdiction. He contends that he "does not do business in or own property in the State of Maryland," has not had "substantial, continuous, and systematic" contacts with the state, and did not direct any activity at Maryland related to this case. Inter.'s Mot. to Dismiss 4-5. Howard argues that because Fisher has significant contacts with Maryland, including those related to this case, there is general and specific jurisdiction over him. Pl.'s Opp'n 13-16.

1. Specific Jurisdiction

There is specific jurisdiction when the defendant's "contacts relate to the cause of action and create a substantial connection with the forum state." *Diamond Healthcare of Ohio, Inc. v. Humility of Mary Health Partners,* 229 F.3d 448, 450 (4th Cir. 2000). To determine if there is specific jurisdiction over Fisher, the Court must consider (1) whether Maryland's long-arm

statute applies, and (2) whether the exercise of jurisdiction would comport with due process. *Ellicott Mach. Corp. v. John Holland Party, Inc.*, 995 F.2d 474, 477 (4th Cir. 1993).

Because the Maryland long-arm statute is co-extensive with the scope of jurisdiction permitted by due process, the statute and constitutional inquiries merge. *Mohamed v. Michael*, 279 Md. 653, 657 (1977). But, analysis under the long-arm statute is the appropriate first step in determining personal jurisdiction. *Mackey v. Compass Marketing, Inc.*, 391 Md. 117, 892 A.2d 479, 493 n.6 (2006).

      a.   Maryland's Long-Arm Statute

The Maryland long-arm statute limits jurisdiction to claims "aris[ing] from any act enumerated in the statute." Md. Code Ann., Cts. & Jud. Proc. § 6-103 (a). A claimant must "identify a specific . . . provision authorizing jurisdiction," and show that its claim arises from the activity specified in that provision. *Ottenheimer Publishers, Inc. v. Playmore, Inc.*, 158 F. Supp. 2d 649, 652 (D. Md. 2001). Then, "to the extent that a defendant's activities are covered by the statutory language, the reach of the statute extends to the outermost boundaries of the due process clause." *Id.*

Howard contends that Fisher is subject to personal jurisdiction as one who "transacts any business or performs any character of work or service in [Maryland]," and its

counterclaim arises from Fisher's business transactions here. Md. Code. Ann., Cts. & Jud. Proc. §§ 6-103 (b)(1). A non-resident transacts business within Maryland when his "actions culminate in 'purposeful activity' within the State." *Bahn v. Chicago Motor Club Ins. Co.*, 98 Md. App. 559, 568 (Md. Ct. Spec. App. 1993). "[P]urposeful activity may be shown by a non-resident defendant initiating contact with the forum state." *Costar Realty Info., Inc., v. Field*, 612 F. Supp. 2d 660, 671 (D. Md. 2009).

Howard argues that Fisher "procured" his alleged rights to the insurance proceeds by going to Baltimore to secure Giannasca and McCrary's agreement to finance the Plaza Tower project, and by calling McCrary in Baltimore to secure the October Letter Agreement. He later concealed the insurance proceeds by telling McCrary's Maryland accountant that no proceeds would be paid for the hurricane damage, and by meeting with McCrary and Giannasca in Maryland. Fisher also "used some of the funds [from the insurance proceeds] to transact business in Maryland." Pl.'s Opp'n 9.

Fisher's own testimony that (1) he traveled to Maryland to ensure that Giannasca and McCrary were "on board" for the Plaza Tower project,[7] (2) later arranged to meet with Giannasca and McCrary—a Maryland resident—in Baltimore to discuss the

---

[7] Fisher Dep. 111:1-6, March 6, 2008.

insurance proceeds,[8] and (3) used some of the proceeds to pay his business expenses in Baltimore,[9] is sufficient to show that he transacted business in the state within the meaning of § 6-103(b)(1).[10] Further, Fisher's purposeful activity in Maryland "relat[es] to one or more of the elements of [Howard's] cause of action." *Talegen Corp. v. Signet Leasing & Fin. Corp.*, 104 Md. App. 663, 670 n.3 (Md. Ct. Spec. App. 1995) ("all elements of a cause of action need not be founded on acts that have taken place in [the forum state]" to show specific jurisdiction).

The counterclaim alleges conversion. *See* ECF No. 68. To prove conversion under Louisiana law,[11] Howard must show "some . . . wrongful taking or a wrongful detention, or an illegal user or misuser" of its property. *Alert Centre, Inc. v. Alarm Protection Servs., Inc.*, 967 F.2d 161, 165 n.2 (5th Cir. 1992)

---

[8] Fisher Dep. 21:24-22:5, March 25, 2010.

[9] Fisher Dep. 241:15-242:1, June 4, 2007.

[10] *See Giannaris v. Cheng*, 219 F. Supp. 2d 687, 692-93 (D. Md. 2002)(court had specific jurisdiction when defendant "initiated the business relations and came to Maryland seeking investment from Maryland residents.").

[11] "A federal court sitting in diversity must apply the choice-of-law rules from the forum state." *Wells v. Liddy*, 186 F.3d 595, 521 (4th Cir. 1999). Maryland follows the rule of *lex loci delicti* to determine the applicable law in tort actions. *Phillip Morris, Inc. v. Angeletti*, 358 Md. 689, 744 (2000). The rule requires that the court apply the law of "the place where the injury was suffered, not where the wrongful act took place." *Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 511 (4th Cir. 1986). Because Howard's injury was suffered in Louisiana, Louisiana law applies. *Id.*

10

(quoting *Importsales, Inc. v. Lindeman*, 92 So.2d 574, 576 (La. 1957)). Howard's theory is that Fisher concealed CCE's receipt of the insurance proceeds from McCrary and Giannasca, thereby preventing the proceeds from being paid to Howard under the November Letter Agreement. To do this, Fisher met with McCrary and Giannasca in Maryland. Fisher also used Howard's property for his own benefit when he paid Maryland business expenses with the proceeds. This is sufficient to show that the counterclaim arises out of Fisher's purposeful activities in Maryland. *See Talegen Corp.*, 104 Md. App. at 670 n.3.

      b. Due Process

Due process is satisfied when the defendant has minimum contacts with the forum state such that "maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). In evaluating whether specific jurisdiction over Fisher comports with due process, the Court considers: (1) "whether and to what extent [he] purposely availed [him]self of the privileges of conducting activities in the forum state, and thus invoked the benefits and protections of its laws," (2) "whether [Howard's] claim arises out of those forum-related activities," and (3) "whether the exercise of jurisdiction is constitutionally reasonable." *Yates v. Motivation Indus. Equip.*

Ltd., 38 Fed. Appx. 174, 176 (4th Cir. 2002)(internal quotation marks omitted).

The first two inquiries have been addressed under the Maryland long-arm statute. *See St. Paul Mercury Ins. Co. v. Am. Bank Holdings, Inc.*, 691 F. Supp. 2d 626, 630 (D. Md. 2010). The final inquiry, constitutional reasonableness, depends on several factors, including: (1) "the burden on the defendant," (2) "the interests of the forum State," (3) "the plaintiff's interest in obtaining relief," (4) "the interstate judicial system's interest in obtaining the most efficient resolution of controversies," and (5) the "shared interest of the several States in furthering fundamental substantive social policies." *Asahi Metal Indus. Co. v. Super. Ct.*, 480 U.S. 102, 113 (1987).

The burden on Fisher to litigate in Maryland is not great. He has previously litigated here and has traveled to the state frequently.[12] Although Maryland may not have a strong interest in adjudicating a Louisiana state law dispute between two non-residents, the Maryland legislature "in enacting the[] [long-arm] statute expressed the interest of [the state] in this litigation and the intention of the state that such causes of action be litigated [here]." *Campbell v. Johnson & Towers,*

---

[12] *See Snyder v. Phelps*, 2007 WL 3071412, at *7 (D. Md. June 5, 2007)(burden on non-resident defendants to litigate in Maryland "would not be too great" when defendants were able to come to the state to engage in the activities that were subject of the litigation).

*Inc.*, 123 F. Supp. 2d 329, 337 (D.S.C. 1999). Further, resolution of the counterclaim in this Court is efficient and desirable for Howard and the national judicial system because the counterclaim depends on many of the same facts and witnesses as Howard's claims against CCE and GNO.[13]

Traditional notions of fair play and substantial justice will not be offended by this Court's exercise of jurisdiction over Fisher. Accordingly, Fisher's motion will be denied.

III. Conclusion

For the reasons stated above, Fisher's motion to dismiss for lack of personal jurisdiction will be denied.

____5/4/11____  
Date

____/s/ William D. Quarles____  
William D. Quarles, Jr.  
United States District Judge

---

[13] *See St. Paul*, 691 F. Supp. 2d at 631 ("the states have an interest in adjudicating claims in a single action against all defendants.").